**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **QUANARDO TAYLOR,** | : | **Civil No. 3:12-CV-891** |
| | : | |
| **Plaintiff** | : | **(Judge Caputo)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **D. REINARD,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

Quanardo Taylor, a federal inmate in the custody of the Bureau of Prisons, commenced this action on May 14, 2012, against D. Reinard, a senior correctional officer at the United States Penitentiary in White Deer, Pennsylvania (USP-Allenwood).[1]  Taylor alleges that on July 20, 2011, Senior Officer Dallas Reinard subjected Taylor to excessive force in violation of the Eighth Amendment by forcing Taylor to remove his arm from the food wicket[2] on Taylor's cell door in the Special Management Unit (SMU) at USP-Allenwood.  Taylor admits to sticking his arm out

---

[1]  Taylor is now housed at the United States Penitentiary in Florence, Colorado.

[2]  A "wicket" is a slot located on a prison cell door, and is used to pass items into a prison cell and to receive items from within the cell.  It is used by corrections staff to remove hand restraints on an inmate without the need to open the cell door.  According to the defendant, the wicket is covered by a flat plate with hinges and a key lock.

of the food wicket, and to refusing orders to remove his arm from the wicket, both of which are sanctionable violations of prison rules. Nevertheless, Taylor claims that Reinard used unnecessarily excessive amounts of force when pushing Taylor's arm back through the food wicket, alleging that Senior Officer Reinard "assaulted [him] by pushing [his] arm shut in the wicket/feed slot of SHU Range A cell 104. He slammed it in there and would not stop pushing on it until he drew blood." (Doc. 1.) Taylor seeks $3.5 million in damages for alleged physical and psychological injuries that he claims to have sustained as a result of this incident.

The defendant has moved for summary judgment (Doc. 31.), arguing that the undisputed facts in this case, including unchallenged video evidence that captured the entire incident, demonstrate that there is no evidence to support Taylor's claims. Lastly, the defendant argues that he would also be entitled to qualified immunity from Taylor's unsupported claims. The motion is fully briefed and is ripe for disposition.[3]

_____

[3] Although the parties have briefed the motion, we note that the plaintiff has failed to respond in any meaningful way to the statement of undisputed facts submitted by the defendant. (Doc. 36.) Accordingly, pursuant to Local Rule 56.1, those facts may fairly be deemed admitted. As discussed, however, the facts submitted are substantially corroborated by the video documentary evidence that the defendant has submitted under seal, and which Taylor himself has viewed. (Doc. 35, at 12 n.2.) Thus, the evidence in this case entirely supports the defendant's assertions regarding what transpired on July 20, 2011, at Taylor's cell door in the Special Housing Unit at USP-Allenwood.

Upon consideration, it is recommended that the motion be granted and the case closed.

## II.  BACKGROUND

Quanardo Taylor arrived at USP-Allenwood on September 20, 2010. (Doc. 36, Def. SMF, ¶ 1.)  On July 20, 2011 Taylor was housed in the Special Housing Unit (SHU) at USP-Allenwood, on non-punitive administrative detention.  (Id. ¶ 2.)  On that date, Senior Officer Reinard was assigned to work in the SHU as the number 3 officer from 1:45 p.m. until 9:45 p.m.  (Id. ¶ 3.)  As part of his duties on the SHU, Senior Officer Reinard was charged with moving inmates to and from recreation; passing out personal hygiene items, writing supplies, and razors; conducting cell searches; collecting and passing out mail and laundry; passing out meals and collecting food trays; supervising inmate orderlies; conducting prisoner counts; conducting welfare rounds; and responding to emergency situations.  (Id. ¶ 4.)

On July 20, 2011, shortly after 5:00 p.m., Senior Officer Reinard entered the A Range of the SHU and began passing out food trays to inmates, beginning with cell number 101.  (Id. ¶ 5.)  In order to pass trays to inmates, Senior Officer Reinard would first unlock the wicket on the cell door with a key, and pull the wicket open and down, towards himself.  (Id. ¶ 6.)  Opening the wicket in this manner creates a small shelf.  (Id. ¶ 7.)  Senior Officer Reinard would then place food trays on the

wicket, and the inmates assigned to the cell would pull the food trays into their cells, and Senior Officer Reinard would close and lock the wicket.  (Id. ¶ 8.)

At approximately 5:10 p.m., Senior Officer Reinard arrived at cell 104, which was occupied by Taylor and his cell mate, Christopher Anthony Bailey.  (Id. ¶ 10.) In the manner described above, Senior Officer Reinard unlocked the wicket and pulled the wicket open towards himself.  (Id. ¶ 11.)  Senior Officer Reinard then handed Taylor four food trays and Taylor took the trays into his cell.  (Id. ¶¶ 12-13.) However, as Senior Officer Reinard attempted to close and lock the wicket, Taylor reached his hand out of the wicket towards him.  (Id. ¶ 14.)  Senior Officer Reinard perceived this action as an immediate physical threat, and he attempted to close and secure the wicket to avoid being assaulted.  (Id. ¶ 15.)  At the same time, Senior Officer Reinard gave Taylor direct orders to stop pushing on the wicket, and to let him close it.  (Id. ¶ 16.)  Taylor disregarded Senior Officer Reinard's orders, and instead continued to block the wicket from closing with his right arm.  (Id. ¶ 17.)

Shortly after this incident began, Senior Officer Reinard could see both of Taylor's hands, and quickly observed that Taylor did not appear to have a weapon. This assured Senior Officer Reinard that he did not, in fact, face an immediate physical threat, and he retreated by backing away from the cell door.  (Id. ¶ 19.) Taylor, meanwhile, continued to hang his arm out of the wicket, thus preventing it

from being secured. (Id. ¶ 20.) This entire incident took place within approximately 30 seconds. (Id. ¶ 21.) At this point, Senior Officer Reinard continued to pass out meal trays to the other inmates on the floor without incident, and then departed A range at approximately 5:20 p.m. (Id. ¶ 22.)

After departing, Senior Officer Reinard contacted SHU number 1 officer, Senior Officer Bolig, to inform him about what happened with Taylor. Senior Officer Bolig, in turn, contacted Operations Lieutenant James Nickerson. (Id. ¶ 23.) At approximately 5:30 p.m., Lieutenant Nickerson arrived at Taylor's cell to address the situation with Taylor, and at this time Taylor pulled his arm back inside the cell. (Id. ¶ 24.) At 5:36 p.m., Lieutenant Nickerson walked away from Taylor's cell door. (Id. ¶ 25.) At this time, Senior Officer Reinard approached Taylor's cell door and was able to secure the wicket without further incident. (Id. ¶ 26.)

In response to Taylor's actions, Senior Officer Reinard wrote an incident report charging Taylor with a code 298 violation (interfering with staff in performance of duties) and a code 307 violation (refusing to obey an order of any staff member) of the Bureau of Prisons (BOP) disciplinary code. (Id. ¶ 27; Ex. 1, Declaration of Dallas Reinard, Attach 1, Incident Report.) In addition, Senior Officer Reinard prepared a memorandum of the incident with Taylor, which was also dated July 20, 2011, and

he submitted this memorandum to Lieutenant Nickerson. (Def. SMF ¶ 28; Ex. 1, Reinard Decl., Attach. 2, Memorandum.)

At no time did Taylor tell Senior Officer Reinard that his arm was bleeding, and Senior Officer Reinard did not witness any blood on Taylor's arm. (Def. SMF ¶ 29.) Senior Officer Reinard also denies that Taylor ever requested to speak with a lieutenant. (Id. ¶ 30.) Aside from this single incident, Senior Officer Reinard had no other run-ins or disciplinary problems with Taylor. (Id. ¶ 31.)

On July 20, 2011, Lieutenant Nickerson was assigned to work as the Operations Lieutenant from 4:00 p.m. until 12:00 a.m., and was the highest-ranking staff member assigned to that shift. (Id. ¶¶ 32-33.) In this capacity, Lieutenant Nickerson was responsible for supervising other correctional services staff, maintaining the safety and security of the institution, and for handling any emergency situations. (Id. ¶ 33-35.)

At approximately 5:20 p.m. on July 20, 2011, Lieutenant Nickerson was informed by Senior Officer Reinard that Taylor had put his arm out of the wicket in his cell door to prevent the officer from securing it. (Id. ¶ 36.) Senior Officer Reinard informed the lieutenant that he initially thought that Taylor had stuck his arm out as a threat, and Senior Officer Reinard reacted by trying to secure the wicket. (Id. ¶ 37.) Senior Officer Reinard thereafter reported that Taylor refused to pull his arm

back, and the officer then left the wicket open, finished his food tray distribution, and left the range in order to inform the lieutenant of the situation. (<u>Id.</u> ¶ 38.)

At 5:30 p.m., Lieutenant Nickerson went to the SHU to speak with Taylor, and Taylor told the lieutenant that he was being disruptive in order to speak with him. (<u>Id.</u> ¶ 39.) Taylor also told the lieutenant that the skin on his arm had been pinched when Senior Officer Reinard attempted to secure the wicket. (<u>Id.</u> ¶ 41.) Lieutenant Nickerson told Taylor that he would receive an incident report for his behavior, and Taylor subsequently pulled his arm back into his cell. (<u>Id.</u> ¶¶ 42-43.) This meeting took approximately five minutes, after which the lieutenant departed the range and Senior Officer Reinard secured the wicket without further incident. (<u>Id.</u> ¶¶ 44-45.)

Following his departure, Lieutenant Nickerson reviewed the videotape footage of the area, and concluded that the video supported Senior Officer Reinard's statement about what had occurred with Taylor. (<u>Id.</u> ¶ 46.) Lieutenant Nickerson also ensured that the EMT on duty, Arden Duttry medically assessed Taylor, and then prepared a memorandum of he incident that he submitted to Captain Kenneth Gabrielson. (<u>Id.</u> ¶¶ 47-48.) Lieutenant Nickerson told Captain Gabrielson that Taylor had complied with the direction to put his arm back into his cell, and the lieutenant, therefore, did not believe that a calculated use of force was necessary in order to address Taylor's conduct. (<u>Id.</u> ¶ 50.) Finally, the lieutenant told Captain Gabrielson

that he believed Taylor's actions had presented a threat to Senior Officer Reinard and other staff and inmates.  (Id. ¶ 51.)

On July 20, 2011, EMT Arden Duttry was assigned to work as the evening shift paramedic.  (Id. ¶ 58.)  In this role, Duttry assesses and treats inmates, and he provides emergency medical care when needed.  (Id. ¶¶ 59-60.)  On the date of the wicket incident, Duttry conducted a medical assessment of Taylor at approximately 6:00 p.m.  (Id. ¶ 62.)  During this assessment, Taylor reported that he had been injured and he rated his pain as a "3" on a scale of one to ten, and he described the pain as sharp.  (Id. ¶¶ 64-65.)  Taylor also told the EMT that he was attempting to get the lieutenant to come talk to him, and he put his arm out of the wicket, after which Senior Officer Reinard attempted to push his arm back into the cell and Taylor's arm was pinched.  (Id. ¶ 67.)  EMT Duttry assessed Taylor's arm and noted that there was a small 1.5 cm abrasion to the right forearm, but no swelling or other injuries.  (Id. ¶ 70.)  EMT Duttry concluded that no further medical care, emergency or otherwise, was required, and Taylor was instructed only to follow up with sick call if needed. (Id. ¶¶ 72, 75.)

On October 4, 2011, Taylor was called before the USP-Allenwood Discipline Hearing Officer (DHO) regarding the incident report that had been issued by Senior Officer Reinard.  (Id. ¶ 77.)  During this hearing, Taylor admitted his guilt to the

DHO, stating: "I'm guilty of holding the slot. I didn't remove my arm and I wanted to talk to a Lt." (Id. ¶ 78.) At the conclusion of the hearing, based in part on this evidence, the DHO concluded that Taylor had committed the prohibited act of refusing to obey an order of any staff member, but expunged the charge of interfering with a staff member in the performance of duties. (Id. ¶¶ 79-80.) As punishment for this offense, Taylor forfeited 7 days of good conduct time, received 15 days of disciplinary segregation time, and lost three months of telephone privileges. (Id. ¶ 81.)

Because Taylor had accused Senior Officer Reinard of abusing him on July 20, 2011, the allegation was referred to the Office of Internal Affairs (OIA) for an investigation. (Id. ¶ 82.) On October 26, 2011, Senior Officer Reinard was interviewed and provided an affidavit. (Id. ¶ 83.) On November 2, 2011, Lieutenant Nickerson was also interviewed and provided his own affidavit. (Id. ¶ 84.) On November 4, 2011, investigators spoke with Captain Gabrielson, and provided an affidavit in which he confirmed that Lieutenant Nickerson had informed him about the incident on the night it occurred, and he reiterated the information the Lieutenant Nickerson had provided to him in his report that evening. (Id. ¶¶ 106-108.) The information that OIA reviewed, including the interviews and affidavits from the foregoing prison staff, EMT Duttry's medical assessment, and a video recording that

captured the incident,[4] confirmed the representations made by Senior Officer Reinard,

Lieutenant Nickerson, and Captain Gabrielson about what had occurred on July 20,

2011. The investigation into Taylor's allegations concluded on November 9, 2011,

and Taylor's allegations of "physical abuse of an inmate" was not sustained. (Id. ¶¶

114-116.

This litigation followed when on February 16, 2012, Taylor filed a <u>Bivens</u>[5]

action against Senior Officer Reinard. (Doc. 1.) On September 28, 2012, the

defendant filed the pending motion to dismiss or, in the alternative, for summary

judgment. (Doc. 67.)

## III.   <u>STANDARD OF REVIEW</u>

Defendants have filed a dispositive motion, seeking judgment in their favor

either through an order dismissing the amended complaint for failure to state a claim

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or through

---

[4] The defendant has provided a copy of this video recording the Court under seal, although Taylor has seen the video as part of this litigation. The video is just over one hour in duration, although the pertinent segments are especially abbreviated. What the video reveals is accurately summarized in paragraph 113 of the defendant's statement of material facts.

[5] <u>Bivens v. Six Unnamed Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

summary judgment entered pursuant to Rule 56. The standards governing each basis for relief are summarized below.

## A.    Motion to Dismiss - Rule 12(b)(6)

Rule 12(b)(6) provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for assessing the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has recently described the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (12007) continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)]and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u> –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. <u>Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.</u>,

20 F.3d 1250, 1261 (3d Cir. 1994).  However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).  Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged."  <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983).  As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do."  <u>Id.</u> at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level."  <u>Id.</u>

In keeping with the principles of <u>Twombly</u>, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss.  In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  <u>Id.</u> at 679.  According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 678.  Rather, in conducting a

review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

## B.    Summary Judgment - Rule 56

Federal courts are permitted to summarily adjudicate an action in order to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a jury trial would, therefore, "be an empty and unnecessary formality," Peynado v. Sabol, No. 09-355, 2010 U.S. Dist. LEXIS 134131, 2010 WL 5300563, at *2 (M.D. Pa. Dec. 20, 2010). Rule 56 specifically provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a
material fact is genuine only if there is a sufficient evidentiary basis that would allow
a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes
shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec.
& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown
that there is an absence of evidence to support the nonmoving party's claims, "the
non-moving party must rebut the motion with facts in the record and cannot rest
solely on assertions made in the pleadings, legal memoranda, or oral argument."
Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord
Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to
make a showing sufficient to establish the existence of an element essential to that
party's case, and on which that party will bear the burden at trial," summary judgment
is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if
the non-moving party provides merely colorable, conclusory, or speculative evidence.
Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence
supporting the nonmoving party and more than some metaphysical doubt as to the
material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Furthermore, in a case such as this, where critical events at issue have been captured on videotape, the Court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts.  In fact, it is clear that, in this setting, we must view the facts in the light depicted by the videotape.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").  This principle applies with particular force to inmate excessive force claims which entail videotaped encounters with staff.  Where a videotape refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate.  <u>Tindell v. Beard</u>, 351 F. App'x 591 (3d Cir. 2009).

## IV.    DISCUSSION

### A.    The Undisputed Facts of Record Reveal that There is No Evidence to Support the Plaintiff's Eighth Amendment Claim

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials. U.S. Const. amend. VIII; see also Whitley v. Albers, 475 U.S. 312, 319 (1986). The Eighth Amendment restrains prison officials from applying excessive force against inmates, Hudson v. McMillian, 503 U.S. 1, 5 (1992), and it imposes affirmative duties on prison officials to provide humane conditions of confinement, Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).

In this case, Taylor claims that Senior Officer Reinard subjected him to excessive force in violation of the Eighth Amendment when he attempted to force Taylor's arm back through the wicket on July 20, 2011. In order to prevail on such a claim, Taylor bears the burden of proving that the force that Senior Officer Reinard used during this incident "was applied . . . maliciously and sadistically to cause harm" and not "in a good-faith effort to maintain or restore discipline." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); see also Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

In order for courts to evaluate whether or not force was applied in good-faith or, instead, sadistically and maliciously to cause harm, several factors may be relevant, including: (1) the need for the application of force; (2) the relationship between the need for force and the amount of force actually used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of a forceful response. Whitley v. Albers, 475 U.S. 312, 321 (1986). The focus of the inquiry is "driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries." Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002). At the same time, the Supreme Court has made clear that the Eighth Amendment does not protect an inmate against objectively *de minimus* use of force. Hudson, 503 U.S. at 9-10 ("[T]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimus* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'") (quoting Whitley, 475 U.S. at 327 (citations omitted)). Thus, when considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7

18

(1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.' " Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

While summary judgment is not appropriate " 'if it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reasonable inference of wantonness in the infliction of pain,' " Brooks, 204 F.3d at 106 (quoting Whitley, 475 U.S. at 322), in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and

sadistically," and may enter summary judgment on an excessive force claim. <u>Tindell</u> <u>v. Beard</u>, 351 F. App'x 591, 596 (3d Cir. 2009).

Review of the record in this case shows that it falls well short of this standard, as the evidence is undisputed that Senior Officer Reinard used no more than *de minimus* force in an effort to restore discipline and guard against a threat when Taylor, in flagrant violation of prison rules, stuck his arm out of the cell door wicket and refused a direct order to pull it back in.

Thus, we conclude that viewing the evidence in the light most favorable to Taylor, it would be impossible for a juror to conclude that Senior Officer Reinard exerted excessive force upon Taylor on July 20, 2011. As a threshold matter, the only force that was applied in this case was the isolated effort by Senior Officer Reinard to close and secure the wicket on Taylor's cell door. (Def. SMF ¶ 14.) It is undisputed that Taylor's insistence in sticking his arm out of the wicket, and refusing to remove it, was a security violation of prison rules, and constituted a threat to officers and other inmates. (<u>Id.</u> ¶ 51.) Moreover, we note that Taylor was housed in the SHU, which is the most secure unit within USP-Allenwood, and houses numerous inmates who have been charged with violating BOP rules or otherwise committing additional criminal acts. (<u>Id.</u> ¶ 52.) To maintain security in the SHU, cell doors are kept closed at all times, including the wickets. (<u>Id.</u> ¶ 53.) These procedures are

strictly followed in order to protect staff from having inmates throw items at them, from being assaulted, and to limit inmates passing contraband within the unit. (Id. ¶ 54.)

The record is unchecked that Senior Officer Reinard gave Taylor repeated orders to stop pushing on the wicket, and to permit it be secured, but that Taylor continued to push against the wicket, at one point using both hands to do so. (Id. ¶¶ 16-18.) Shortly after this incident commenced, Senior Officer Reinard was able to see both of Taylor's hands, and noted that he did not have a weapon and did not otherwise present an immediate physical threat, and he thereafter retreated from Taylor's cell. (Id. ¶ 19.) As the defendant appropriately emphasizes, the entire incident between the moment when Senior Officer Reinard attempted to close the wicket, until he stepped away from the cell door, took approximately 30 seconds. (Id. ¶ 21.) Our review of the evidence, and particularly the video evidence, makes clear that Senior Officer Reinard's actions were not only reasonable, but undertaken with a minimal use of force deemed necessary under the brief incident.

We note further that Taylor has admitted he was attempting to keep his wicket open in order to force a meeting with a lieutenant. (Id. ¶ 93.) Indeed, he admitted his guilt to the violation charged, stating that "I'm guilty of holding the slot. I didn't remove my arm and I wanted to talk to a Lt." (Id. ¶ 78.) Following a hearing, and the

consideration of evidence including Taylor's own admissions, the DHO found that Taylor had committed the prohibited act of refusing to obey the order of a staff member, and Taylor did not appeal this determination or otherwise challenge the sanctions imposed on him. (Id. ¶ 79.) On the basis of these facts alone, it is clear that Senior Officer Reinard was justified in responding to Taylor's violation of prison rules.

More importantly, the evidence is irrefutable that Senior Officer Reinard responded to Taylor's misconduct and refusal to comply with repeated orders by exerting only a *de minimus* amount of force in an initial effort to secure Taylor's wicket. We have reviewed the video evidence that the defendants submitted, in conjunction with the other undisputed evidence that Senior Officer Reinard has submitted, and can confirm that this entire incident took place within approximately half a minute. Senior Officer Reinard's actions were not only abbreviated and wholly appropriate given the circumstances presented by Taylor's recalcitrance, but they represented no more than a minimal use of force in an effort to enforce important prison safety rules. Review of the video evidence in particular makes clear that the force Senior Officer Reinard used could not be considered by any reasonable juror to represent the kind of force that is "repugnant to the conscience of mankind."

Although not dispositive to our inquiry, we also note that Taylor's claim that Senior Officer Reinard slammed his arm in the wicket and "would not stop pushing on it until he drew blood," (Doc. 1, at 1-2), finds no support in the record. Indeed, the EMT who evaluated Taylor observed only a minimal abrasion that occurred during this incident, and the EMT concluded that neither emergency intervention nor any immediate medical care was necessary. Thus, the evidence shows only that Taylor suffered some very minimal surface injury as a result of reasonable force exerted in response to Taylor's admitted violation of prison rules.

In addition, we also find that the evidence shows that Taylor's act of forcing the wicket on his cell door open presented a security concern for the institution, prison staff, and other inmates. Lieutenant Nickerson has attested to the threat that Taylor's actions posed, within a highly secure wing of the penitentiary, where inmates who had violated BOP rules or committed other criminal acts were being held.

Thus, following our review of the undisputed evidence in this case, we find no evidence to support Taylor's bald contention that Senior Officer Reinard subjected him to a malicious and sadistic use of physical force in an effort to cause harm; to the contrary, the evidence shows only that Senior Officer Reinard used no more force than was necessary given the circumstances. Taylor's claim fails on the merits.

**B.     Qualified Immunity**

Even if we were to find some evidence supporting the plaintiff's claim that Senior Officer Reinard violated his Eighth Amendment rights, we would nevertheless find that summary judgment would be warranted because the defendant is entitled to qualified immunity under the facts of this case.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005). In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances

presented by the particular case at hand. <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case." <u>Id.</u> at 201. Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 253 (3d Cir. 2010).

Officials will be immune from claims for damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987). In this case, Senior Officer Reinard would plainly be entitled to qualified immunity under this standard and the facts of this case. We have already found that the evidence shows that Taylor's Eighth Amendment rights were not violated by Senior Officer Reinard. Thus, we also find that no reasonable official could have concluded that Senior Officer Reinard's conduct was illegal or even unreasonable, and this officer plainly

did not violate any constitutional right that was clearly established on the date of the

incident by endeavoring to gain control of a situation that Taylor alone created, and

in using the least amount of force necessary to do so.

## V.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED

that the defendant's motion to dismiss or, in the alternative, for summary judgment

(Doc. 31.), be GRANTED and the case closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: August 6, 2013.